FILED

2006 Mar-16  PM 01:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **CATHY PRITCHETT,** | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-04-BE-0249-E** |
| | ] | |
| **WERNER COMPANY,** | ] | |
| | ] | |
| **Defendant.** | ] | |
| | ] | |
| | ] | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

This case is currently pending before the court on a motion for summary judgment (doc. # 26) and supporting brief (doc. # 27) filed by defendant Werner Company, which has been fully briefed and argued.  Having reviewed the parties' submissions and considered the arguments advanced by the parties at oral argument, the court concludes that the defendant's motion for summary judgment is due to be GRANTED in part and DENIED in part.  The court specifically finds that the defendant's motion for summary judgment is due to be GRANTED on the state law invasion of privacy claim, the Title VII retaliation claim, and the negligent hiring, supervision, and retention claim.  However, the defendant's motion for summary judgment is due to be DENIED on the FMLA interference claim and the Title VII sexual harassment claim.

Plaintiff Cathy Pritchett alleges that Werner Company discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*; terminated her in retaliation for complaining of sexual harassment; violated The Family Medical

1

Leave Act ("FMLA"), codified at 29 U.S.C. § 2612; and violated several provisions of Alabama law, specifically, invasion of privacy and negligent hiring, supervision, and retention.  The court has jurisdiction of this case under 28 U.S.C. §1331 pursuant to its federal question jurisdiction and jurisdiction of the state law claims pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a).

The plaintiff filed an objection to the motion for summary judgment with corresponding evidentiary submissions (doc. #32).  On June 8, 2005, the court held a hearing on the defendant's motion for summary judgment.  After hearing the parties' arguments and citations of authority, the court granted the defendant's motion for summary judgment on the plaintiff's FMLA retaliation claim and on her state law invasion of privacy claim.  However, the court reserved ruling on the Title VII claims for retaliation and sexual harassment, and on the remaining state law claim for negligent hiring, supervision, and retention.  With the court's permission, the plaintiff filed a post-hearing supplemental brief (doc. # 41) and the defendant filed a reply to the supplemental brief (doc. # 43).

The facts stated in the light most favorable to the plaintiff are as follows.  Pritchett was hired as a step shear operator at the defendant's Anniston, Alabama manufacturing plant on October 1, 2001.  Approximately one year later, on November 4, 2002, Pritchett requested intermittent FMLA leave based on the adverse side effects of her high blood pressure. Werner requires employees on intermittent FMLA leave to obtain a doctor's excuse for FMLA-related absences and to notify either their shift supervisor or someone in the human resources department that their absence is based on an FMLA-qualifying medical condition.[1]  Human

_____

[1] Lucretia Lambert Dep., R. 116-117.  *See Also*, Pl's Dep., p. 103.

2

Resources Specialist Lucretia Lambert approved the plaintiff's request for intermittent FMLA leave on December 11, 2002.

Pritchett contends that co-employee Danny Thompson began making sexually inappropriate comments to her in December 2002 that continued until her May 2003 termination. Thompson was a materials handler who was responsible for delivering various materials and component parts to Pritchett and assisting her with the operation of her machine.[2]  Plaintiff alleges that Thompson made prurient comments almost everytime she worked in his presence[3] that consisted of remarks related to his sexual prowess, inquiries about Pritchett's sex life, and requests for sexual favors, and dates.[4]  Despite Pritchett's repeated assertions that she was not interested in his "proposals," Thompson's sexually inappropriate comments continued.[5]

Approximately four months later in late April/early May 2003, co-employee Sam Safflod allegedly began making sexually inappropriate comments to the plaintiff.[6]  Saffold was a brake press operator who worked in the vicinity of Pritchett's work station.  According to the plaintiff, Saffold attempted to proposition her for oral sex.  Saffold would also attempt to capture the plaintiff's attention by making sexually-suggestive motions with his tongue.[7]

Plaintiff first notified the defendant of her allegations against Thompson and Saffold on

---

[2]*See* Pl's Dep., p. 56, 63-64, 65.

[3]*See Id.*, p. 63-64.

[4]*See* Doc. # 32, p. vi-vii for a complete recitation of Thompson's sexually inappropriate comments.

[5]*See* Pl's Dep., p. 61.

[6]*Id.*, p. 70.

[7]*Id.*, p. 74-75.

May 13, 2003 when first shift supervisor Tony Hicks saw Pritchett crying at her workstation.[8]
Hicks was the plaintiff's immediate supervisor and also supervised Thompson and Saffold.
When Hicks asked Pritchet why she was crying, the plaintiff told him she was "sick and tired" of
men making sexually inappropriate comments and that she was not able to function under the
stress.[9]  In accordance with Werner's sexual harassment policy, Hicks took Pritchett to the
Human Resources department where she was questioned by Lucretia Lambert.

Lambert admits that Pritchett was visibly upset and crying when Hicks brought her to the
office on May 13, 2003.[10]  Pritchett completed the four-page written statement detailing her
complaints about Saffold and Thompson.  Lambert asked plaintiff for a written statement
detailing her allegations against Thompson and Saffold.[11]  In her discussions with Lambert,
Pritchett listed employees Angial Embry and Sybill Dupree as persons who could corroborate her
allegations.

Plaintiff did not return to work on May 13, 2003 because she suspected that her blood
pressure was elevated.[12]  Pritchett took a vacation day on May 16, 2003 and did not return to
work until Monday, May 19, 2003.[13]  The record does not indicate that the plaintiff had any
further interaction with either Thompson or Saffold after May 13, 2003.

---

[8]*Id.*, p. 78.

[9]Pl's Dep., p. 77.

[10]Lambert Dep., p. 137; 139.

[11]*See* Defense Ex. 5.

[12]Lambert Dep., p. 138.

[13]Pl's Dep., p. 101; 103.

Lambert was the Werner employee charged with investigating the plaintiff's allegations of sexual harassment against Thompson and Saffold.  Lambert interviewed Angial Embry, one of the two employees whom plaintiff named as a potential witness to Saffold and Thompson's sexual harassment.  Embry never admitted to hearing any sexually inappropriate statements but acknowledged that she had been told by the plaintiff that Thompson was making comments that the plaintiff found upsetting.  Lambert did not take any notes during her interview with Embry.

However, Lambert did not interview Dupree.[14]  In her affidavit, Dupree states that "[n]obody from the company ever talked to me about this sexual harassment.  If they had talked to me, I would have confirmed that it happened."[15]  Dupree witnessed Thompson standing close to the plaintiff and talking into Pritchett's ear and staring at her.[16]  However, because of the noise from the nearby machines, Dupree could not hear the conversation but acknowledges that Pritchett was visibly upset.

Lambert concluded her investigation by interviewing Thompson and Saffold.  Both men denied making any inappropriate comments or gestures.[17]  Lambert testified that she warned both men against making any comments that could be interpreted as inappropriate and warned them not to discuss the allegations with other employees.[18]  However, Lambert did not take notes memorializing her interview with either Thompson or Saffold.  Pritchett was not at work during

---

[14]Dupree Aff., Pl's *Ex.* 12 to Opposition to Motion for Summary Judgment.

[15]*Id.*, ¶ 5.

[16]*Id.*, ¶ 3.

[17]Lambert Dep., p. 146.

[18]*Id.*, p. 146-147.

the time frame of Lambert's investigation.[19]

The parties agree that Lambert's investigation did not comport with Werner's sexual harassment policy.[20]   Specifically, Lambert admits that she (1) did not document her interview with Pritchett, and instead relied on the plaintiff's four page written statement; (2) did not prepare a written statement of the allegations in narrative form for the plaintiff's signature; (3) did not require the plaintiff to acknowledge the truth or accuracy of the written statement; (4) require the plaintiff to acknowledge that Lambert had advised her about Werner's policy on non-retaliation and the mechanisms for reporting retaliation; (5) did not take notes memorializing her interviews of third-party witnesses; (6) did not obtain written statements from Thompson and Saffold; and (7) did not discuss her findings with the defendant's legal department or prepare a summary report of the investigation.

Plaintiff returned to work on Monday, May 19, 2003 and worked for approximately two hours before she was summoned to a meeting in Lambert's office.  During the above-referenced two hour period, plaintiff did not have any contact with the alleged harassers.[21]  In their meeting, Lambert told Pritchett that the lack of witness corroboration coupled with Thompson and Saffold's denials made it impossible for her to conclude that the plaintiff had been subjected to legally actionable sexual harassment.[22] However, Lambert advised Pritchett that Thompson and Saffold had been warned that Werner would not tolerate any future inappropriate conduct and

---

[19]*Id.*, p. 172.

[20]*See* Defense Ex. 13.

[21]Pl's Dep., p. 108.

[22]*Id.*, p. 109, 117.

6

encouraged plaintiff to report any future problems or retaliatory conduct.[23]  When Pritchett asked

that Thompson and Saffold be moved to another department, Lambert denied her request but

offered to move the plaintiff to a department where she would not have to work with Thompson

or Saffold.[24]

The plaintiff was extremely upset with the results of Lambert's investigation.  Pritchett

mentioned that she felt sick and indicated that she needed to go see her doctor.  Lambert

expressed concern, advised the plaintiff to go see her doctor, and to let the company know if she

needed assistance.  The plaintiff never returned to work after May 19, 2003.

Corporate policy requires employees to notify their department supervisor or a human

resources employee when they are going to be absent.[25]  Werner employees receive a card with

an extension number for every department.  Every telephone at the facility has voice-mail

capability.

To enforce its attendance policy, Werner has a "No Call/No Show"policy that states

"Unauthorized Absence for three (3) scheduled workdays without notice or prior approval by

Management will be considered as a voluntary 'Quit without Notice.'"  When an employee is

absent and does not notify either the immediate supervisor or a member of the human resources

department, the absence is noted as a "No Call."

The implementation of the No Call/No Show Policy is typically initiated by the

employee's shift supervisor after three consecutive unauthorized absences.  The shift supervisor

---

[23]Pl's Dep., 174-175.

[24]*Id.*

[25]Tony Hicks Dep., p. 31.

is required to report the employee to the human resources department.  If the human resources department cannot verify that it received a call from the employee, then the employee is terminated.

Pritchett received a doctor's excuse to cover absences from May 19, 2003 to May 23, 2003.  Pritchett contends that, when she called Lambert to tell her about the note, Lambert told her to bring the doctor's excuse when she returned to work and to "take all the time she needed."[26]  Sometime toward the end of the week, plaintiff contends that Lambert told her not to bother calling on every day.[27]  Lambert allegedly told Pritchett to just let her know when she was able to return to work.[28]  Lambert directed the plaintiff to call her, not Tony Hicks.[29]  Lambert denies all these allegations.[30]

Plaintiff argues that she next attempted to speak with Lambert during the week of June 5, 2003 or June 6, 2003, despite Lambert's assurance that she did not have to call.  However, Lambert did not receive the call because she was on vacation.[31]  Pritchett did not leave a message on Lambert's voicemail.

On June 5, 2003, Hicks, after noting the plaintiff had not reported to work on June 3, 2003; June 4, 2003; and June 5, 2003, sent an email to Lambert on June 5, 2003 notifying her of

---

[26]Pl's Dep., p. 123-124.

[27]Pl's Dep., p. 128-129.

[28]*Id.*

[29]*Id.*, p. 129.

[30]Lambert Dep., p. 184-185.

[31]*See* Lambert Dep., p. 111.

Pritchett's violation of the "No Call/No show" policy.[32]  Hicks testified that he had no other involvement in the decision to terminate Pritchett.[33]

Ordinarily, Lambert would be the person charged with making decisions about termination based on alleged violations of the No Call/No Show policy for non-salaried employees.[34]  However, because Lambert was on vacation on June 5, 2003, human resources manager Jerry Lowe made the decision to terminate plaintiff for violating the No Call/No Show policy.  Lowe testified that he had no knowledge of the plaintiff's prior sexual harassment complaint or any knowledge that she had been previously granted intermittent FMLA leave when he made the decision to terminate her.

When Pritchett finally spoke to Lambert on June 11, 2003, she learned that she had been terminated, effective June 5, 2003, for violating the "No Call/No Show" policy.  Pritchett's version of the June 11, 2003 conversation is that, while she indicated that she did not want to work with Thompson and Saffold, Lambert did not even mention reinstatement as option, but simply told Pritchett that she had been terminated for violating Werner's "No Call/No Show" policy.[35]

Plaintiff filed suit in this court on February 6, 2004 alleging that her termination was in violation of Tittle VII, the FMLA, and Alabama state law.

---

[32]Hicks Dep., p. 26-27.  *See also*, Def's *Ex.* 16.

[33]*Id.*, p. 42.

[34]Jerry Lowe Dep., p. 34, 40.  *See* Aff. of Lucretia Lambert, ¶ 1.

[35]*See* pl's dep., p. 128.

## II. STANDARD OF REVIEW AND DISCUSSION

Summary judgment is an integral part of the Federal Rules of Civil Procedure and allows a trial court to decide cases where no genuine issues of material facts are present.  Fed. R. Civ. P. 56.  Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  *See also, Celotex v. Catrett*, 477 U.S. 317, 327 (1986).  A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 251-52.  In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him."  *Ryan v. Int'l Union of Operating Eng'rs, Local* 675, 794 F.2d 641, 643 (11th Cir.1986).

### A. THE FAMILY MEDICAL LEAVE ACT

The FMLA provides an eligible employee up to twelve weeks of leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  The FMLA establishes a private cause of action for either (1) interference with the exercise of rights provided by the FMLA pursuant to 29 U.S.C. § 2615(a)(1), (2) discrimination against an employee for opposing any practice made unlawful by the FMLA, or (3) interference "with proceedings or inquiries" pursuant to 29 U.S.C. § 2615(b)(1)(2)(3).

In an interference claim, the plaintiff must show that he or she was "entitled to the benefit denied."  *Rusell v. North Broward Hosp*., 346 F.3d 1335, 1340 (11th Cir. 2003).  To establish a claim of interference under the FMLA, a plaintiff must demonstrate that (1) she is an eligible employee under the FMLA; (2) the defendant is a covered employee under the FMLA; (3) the

plaintiff was entitled to leave under the FMLA; (4) the plaintiff gave appropriate notice to the

defendant of his intention to take leave; and (5) the defendant denied her benefits to which she

was entitled.  *Jennings v. Parade Publ'ns*., 2003 WL 22241511 at *6 (S.D.N.Y. Sept. 29, 2003).

In contrast, a FMLA retaliation claim requires knowledge of the plaintiff's FMLA status.

Consequently, a prima facie FMLA retaliation case requires (1) the existence of a right protected

under the FMLA; (2) an adverse employment action; and (3) a causal connection between the

protected activity and the adverse employment action.  *Cash v. Smith*, 231 F.3d 1301, 1307 (11th

Cir. 2000).

At the June 8, 2005 motion hearing, the court asked plaintiff's counsel to clarify the

precise nature of the FMLA claim.  Although Count III of the complaint appears to allege a claim

for interference of rights protected by the FMLA, the plaintiff's submission in opposition to the

motion for summary judgment only discussed the FMLA claim within the context of retaliation.

Given this ambiguity, the court could not clearly determine whether the plaintiff's FMLA claim

is one for retaliation pursuant to 29 U.S.C. § 2615(a)(2) and/or a claim for interference of rights

protected by the FMLA pursuant to  29 U.S.C. § 2615(a)(1).[36]

Based on counsel's representations that the FMLA claim was only one for retaliation and

not interference, the court orally granted the defendant's motion for summary judgment on the

plaintiff's FMLA claim because of Pritchett's inability to establish that the final decision-maker

and human resources manager Jerry Lowe had knowledge of the plaintiff's FMLA status when he

---

[36]Discerning the precise nature of the plaintiff's claims is crucial in this case because Pritchett has to prove knowledge of the FMLA status by the requisite decision-maker in a retaliation claim but only has to establish eligibility, entitlement to leave, notice of intention to take leave, and denial of benefits protected by the FMLA for an interference claim.

made the decision to terminate Pritchett's employment.[37]  *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  Without evidence of knowledge, a reasonable jury could not infer a causal connection between the plaintiff's exercise of her rights under the FMLA and her termination.

After the motion hearing, plaintiff filed a supplemental brief disavowing her characterization of her FMLA claim as one solely for retaliation, not interference.  In support of the above-referenced disavowal, plaintiff directs the court's attention to Count III of the complaint that clearly states a claim for interference under the FMLA.  In its reply brief, Werner does not contest the re-characterization of the plaintiff's FMLA claim, but instead argues that the interference claim fails because of Pritchett's inability to create a jury question on the issue of notice and on entitlement to reinstatement.

The court disagrees with the defendant's arguments and finds that Pritchett has created jury questions on the issues of notice and entitlement to reinstatement.  Assuming the truth of disputed facts, as the court must at this stage of the proceedings, Lambert had notice that Pritchett's absences were related to the exercise of intermittent FMLA leave for high blood pressure.  An examination of the disputed facts in the light most favorable to the plaintiff indicates that Lambert advised Pritchett that she did not need to make daily contact with her supervisor or produce a doctor's excuse until she returned to work.

Although Werner's written procedures and "No Call/No Show" policy require an absent employee to make daily contact with supervisory personnel and to provide the human resources department with appropriate medical certification, Lambert gave plaintiff permission to deviate

---

[37]*See* deposition of Jerry Lowe, p. 33.

from the above-referenced policies.  The defendant's argument that Lambert's decision to create an exception to the policy nevertheless prevents Pritchett from establishing notice is unpersuasive because the legal standard for notice in the Eleventh Circuit merely requires an employee to "reasonably apprise [the employer] of the employee's request to take time off for a serious health condition."  *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1435 (11th Cir. 1997).  Furthermore, the statutory notice requirement does not require the employee to specifically invoke the statute, but only requires that the employer have enough information to suggest that the absence could, upon further investigation, be classified as one that qualifies for FMLA protection.  *See Gay*, 125 F.3d at 1436.  *See also, Manuel v. Westlake Polymers Corp.*, 66 F.3d 758 (5th Cir. 1995) (holding that "[w]hat is practicable, both in terms of timing of the notice and its content, will depend upon the facts and circumstances of each individual case.").

Lambert may have violated Werner's internal policies, but her decision to make an exception to the reporting requirement has no bearing on the sufficiency of notice under the FMLA.  Given the above-referenced authorities, the court finds that a reasonable jury could conclude that Werner had sufficient notice that the plaintiff's absences after May 23, 2003 were potentially FMLA-protected.

The court also concludes that Pritchett has created a genuine issue of material fact on the issue of whether the plaintiff was denied a benefit to which she was entitled (i.e., reinstatement) under the FMLA.  The FMLA requires restoration "to the position of employment held by the employee when the leave commenced."  29 U.S.C. § 2614(a)(1)(A).

However, the implementing regulations eliminate the obligation to reinstate if an employee is "unable to perform an essential function of the position."  29 C. F. R. 825.214(b).

Furthermore, the implementing regulations provide that "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the ADA." 29 C.F.R. § 825.702(a).  Based primarily on the absence of language relating to reasonable accommodation in the implementing regulations, several courts hold that the FMLA does not require accommodation.  *See e.g., Tardie v. Rehabilitation Hosp*., 168 F.3d 538, 544 (1st Cir. 1999); *Vincent v. Wells Fargo Guard Servs*., 3 F. Supp.2d 1405, 1420 (S.D.Fla. 1998).

Werner argues that the plaintiff's June 11, 2003 conversation with Lambert does not establish that she was requesting reinstatement, but merely that she "could come back to work but I could not work around those guys."[38]  Based on this testimony, Werner argues that "it is clear that plaintiff's return to work was conditioned on the removal of Saffold and Thompson from her work environment.[39]  In essence, the defendant argues that Pritchett is not entitled to reinstatement because restoration to her previous employment was contingent upon an unreasonable accommodation (i.e., Thompson and Saffold's removal).

Werner's interpretation of the June 11, 2003 conversation is certainly novel, but the standard of review dictates that the court interpret the facts *in the light most favorable to the plaintiff*.  Pritchett's version of the June 11, 2003 conversation is that, while she indicated that she did not want to work with Thompson and Saffold, Lambert did not even mention reinstatement as option, but simply told Pritchett that she had been terminated for violating Werner's "No Call/No Show" policy.[40]

---

[38]*See* Pritchett Dep., pp. 128-129; 135.

[39]*See* doc. # 43, p. 9.

[40]*See* pl's dep., p. 128.

Drawing the reasonable inference suggested by the facts, a jury could find that Werner's denial of reinstatement and resulting FMLA violation was not related to its refusal to remove Thompson and Saffold from the work environment, but its unwillingness to reconsider the reinstatement of her employment despite being on notice that the plaintiff's post-May 23, 2003 absences were related to her intermittent FMLA leave.  Consequently, the court finds that a reasonable jury could conclude that the plaintiff was denied benefits to which she was entitled under the FMLA.  Thus, the defendant's motion for summary judgment on this claim is due to be DENIED.

### B. TITLE VII CLAIMS

#### 1. Sexual Harassment Claim

Title VII provides a cause of action for individuals subjected to a sexually hostile or abusive environment.  To establish a prima face case of hostile work environment sexual harassment, Pritchett must show: (1) that she belongs to a protected group; (2) that she has been the subject of unwelcome sexual harassment; (3) that the harassment was based on her sex; and (4) that the harassment "was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatory and abusive working environment"; and (5) a basis for holding the employer liable.  *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1245 (11th Cir. 1999). At issue in this case is whether civil liability can be imputed to Werner.

An employer's liability for hostile environment sexual harassment depends upon whether the alleged harasser is the victim's supervisor or merely a co-employee.  Because employers do not entrust mere co-employees with any significant authority with which they might harass a victim, employers are liable for a co-employee's harassment **only** when the employers have been

negligent either in discovering or remedying the harassment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278-80 (11th Cir. 2002). An employer's legal duty in co-employee harassment cases will be discharged if it takes "reasonable steps to discover and rectify acts of sexual harassment of its employees." *See Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997) (requiring employers to take "prompt remedial actions" in response to harassment).

The parties agree that Pritchett's May 13, 2003 complaint to human resources specialist Lucretia Lambert gave the defendant actual notice of her complaints of sexual harassment against Thompson and Saffold. Consequently, the plaintiff's sexually hostile work environment turns on the issue of the sufficiency of Lambert's investigation. The defendant argues that it is entitled to summary judgment because it took prompt and appropriate corrective action in responding to Pritchett's allegations of harassment.

Most of the facts concerning Lambert's investigation are uncontroverted. Lambert immediately took action upon being informed of the alleged harassment. She questioned both alleged harassers and Angel Embry. Although the court must accept the plaintiff's version of events indicating that Lambert did not question Sybill Dupree, Ms. Dupree's affidavit does not contain any information that would have permitted Lambert to corroborate plaintiff's allegations against Thompson and Saffold. For example, Dupree indicated that, had she been interviewed, she would have acknowledged witnessing Thompson standing close to the plaintiff and talking into her ear and staring at her.[41] However, because of the noise from the nearby machines, Dupree concedes that she did not hear the conversation but acknowledges that Pritchett was visibly upset.

_____

[41]Dupree Aff., Pl's *Ex*. 12 to Opposition to Motion for Summary Judgment.

Furthermore, although Lambert found that her evidence did not corroborate the plaintiff's allegations, she nevertheless warned Thompson and Saffold about making comments that could be interpreted as inappropriate.  Lastly, Lambert offered to move the plaintiff to another work station where she would not have daily contact with either Thompson or Saffold.  Plaintiff had no further contact with either of the alleged harassers after May 13, 2003, the date when the investigation began and the last day she actually worked at the facility.  However, Pritchett never returned to the work environment after May 13, 2003, and thus, by necessity, Thompson and Saffold's alleged harassment "stopped."   Consequently, the court cannot conclude whether the effectiveness of Lambert's investigation quelled the harassment.

The parties also agree that Lambert's investigation did not comport with Werner's sexual harassment policy that outlines in exhaustive detail the protocol for company representatives completing a sexual harassment investigation.[42]   Specifically, Lambert admits that she (1) did not document her interview with Pritchett, instead relying on the plaintiff's four page written statement; (2) did not prepare a written statement of the allegations in narrative form for the plaintiff's signature; (3) did not require the plaintiff to acknowledge the truth or accuracy of the written statement; (4) did not require the plaintiff to acknowledge that Lambert had advised her about Werner's policy on non-retaliation and the mechanisms for reporting retaliation; (5) did not take notes memorializing her interviews of third-party witnesses; (6) did not obtain written statements from Thompson and Saffold; or (7) discuss her findings with the defendant's legal department or prepare a summary report of the investigation.

The court permitted supplemental briefing on the issue of whether the inadequate

_____

[42]*See* Defense Ex. 13.

investigation could form the basis of holding the defendant liable.  Plaintiff submitted authority from other circuits exploring the legal parameters for assessing the reasonableness of the employer's investigation.  *See e.g., Blankenship v. Parke Care Centers, Inc*., 123 F.3d 868, 872-73 (6th Cir. 1997) (holding that "When an employer responds to charges of co-worker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."); *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) ("reasonableness of an employer's remedy will depend on its ability to stop the harassment).

The Eleventh Circuit holds that an employer is civilly liable for the harassment of its co-employees when it failed to take prompt remedial action after receiving notice of the alleged sexual harassment.  The "remedial action" must be "reasonably likely to prevent the misconduct from recurring."  *Kilgore v. Thompson & Brock Mgmt. Inc*., 93 F.3d 752, 754 (11th Cir. 1996) (citing *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990)).

When viewed in the light most favorable to the plaintiff, a reasonable jury could conclude that Lambert's investigation was not reasonably likely to prevent the recurrence of sexual harassment given Lambert's failure to interview Sybill Dupree and failure to follow the defendant's sexual harassment procedures.  Specifically, a juror could conclude that Lambert's conclusion that Pritchett's allegations lacked sufficient corroboration and the denial of the plaintiff's request that Thompson and Saffold be moved to another department was unreasonable given her failure to interview all the alleged witnesses to the incident and to follow the defendant's sexual harassment procedures.  Consequently, the court finds that the defendant's motion for summary judgment is due to be DENIED because Pritchett has created a jury question

18

on the issue of the defendant's liability.

### 2. Retaliation Claim

Pritchett also contends that Werner violated Title VII because it fired her in retaliation for lodging a sexual harassment complaint against Thompson and Saffold.  To establish a *prima facie* case of retaliation, plaintiff must establish that (1) she engaged in a statutorily protected expression; (2) she was subjected to an adverse employment action; and (3) there is a causal link between the adverse employment action and the protected activity.  *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).

At issue in this case is the plaintiff's ability to establish a causal link between her termination and her sexual harassment complaints against Thompson and Saffold.  Although conceding that Jerry Lowe did not know about Pritchett's prior sexual harassment complaint when he made the decision to terminate her, the plaintiff's supplemental brief argues that she can establish the requisite causal connection because Lowe unilaterally followed Hicks' biased recommendation that the plaintiff be fired for termination of the "No Call/ No show" policy. Based on Hicks' knowledge of Pritchett's complaint and his status as the alleged harassers' supervisor, the plaintiff assumes a discriminatory animus and asks the court to impute this purported discriminatory animus to Lowe under a "cat's paw" theory of causation.

In *Stimpson v. City of Tuscaloosa*, the Eleventh Circuit Court established that a plaintiff

may proceed on a "cat's paw"[43] theory of causation where she can show "that the decisionmaker followed [a] **biased recommendation** without independently investigating the complaint against the employee."  186 F.3d  at 1332 (emphasis added).  So, for the plaintiff to prevail on her retaliation claim, the court must find a genuine issue of material fact regarding whether Hicks may have persuaded Lowe into rubberstamping a recommendation to terminate Pritchett that was not based on a violation of the "No Call/ No show" policy, but on Hicks' desire to retaliate against Pritchett for lodging sexual harassment complaints against Thompson and Saffold.

Although the court must view all evidence in a light most favorable to Pritchett, it cannot simply endorse conclusory allegations wholly unsupported by evidence.  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (11th Cir. 1985) (citing 10A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Fed. Practice and Procedure*: Civil 2d § 2738 (1983)).  Hicks' testimony provides the court with absolutely no evidentiary corroboration for Pritchett's contention that he harbored any discriminatory animus against her.

Ironically, Hicks' undisputed testimony is that, in reference to the plaintiff's allegations of sexual harassment, he emailed Lowe indicating that they really needed to get to the bottom of the plaintiff's allegations.[44]  Furthermore, plaintiff's undisputed testimony is that Hicks was the person who personally accompanied her to Lambert's office where she was instructed about the

---

[43]The term "cat's paw" theory of causation describes a situation where a person harboring the discriminatory animus uses the ultimate decisionmaker as a conduit for his or her discriminatory animus. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).  A plaintiff typically proves that the ultimate decisionmaker was a conduit by showing that the decisionmaker simply relied upon, without verifying, a recommendation or false information offered by someone else because of a prohibited animus.  *See Wright v. Southland Corp*., 187 F.3d 1287, 1304 n. 20 (11th Cir. 1999).

[44]*See* Hicks Dep., pp. 50-51.

proper procedure for filing a  sexual harassment complaint.[45]

Given this undisputed evidence, the court cannot impute a discriminatory animus to Lowe, via a "cat's paw" theory of liability, simply because Hicks knew about Pritchett's sexual harassment complaint and because he was Saffold and Thompson's supervisor.  Without evidence establishing Hicks' discriminatory animus, the court concludes that the plaintiff has not created a genuine issue of material fact on the issue of a causal connection between the adverse employment action and the protected activity.  Consequently, the court finds that the defendant's motion for summary judgment is due to be GRANTED on the plaintiff's Title VII retaliation claim.

### C. Negligent Hiring, Retention, and Supervision

Under Alabama law, the master is held responsible for his sevant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to its attention.  *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 667 & 682 (Ala. 2001). Liability depends upon its being established by affirmative proof that such incompetecy was actually known by the master or that, had he exercised due and proper dilligence, he would have learned that which would charge him in the law with such knowledge.  *Id.*

Plaintiff asserts a claim against Werner based on negligent hiring, retention, and supervision.  In the context of a claim for negligent hiring, Alabama courts uniformly hold that a plaintiff must present evidence that the alleged tortfeasor had history of improper conduct similar to conduct alleged or proof to support inference that the employer actually knew, or should have

---

[45] *See* Pl's Dep., p. 78.

known that tortfeasor would engage in the type of conduct alleged.  *See Jackson v. Cintas Corp*.,
391 F. Supp. 2d 1075, 1100 (M.D. Ala. 2005) (citing cases).

In this case, the record contains absolutely no evidence that Werner had any actual or
constructive knowledge of any prior misconduct by Saffold or Thompson.  In short, Werner's
first notice of Saffold and Thompson's alleged misconduct occurred on May 13, 2003, the date
when Pritchett reported the conduct to Lambert.  *See Portera v. Winn Dixie of Montgomery, Inc*.,
996 F. Supp. 1418, 1438 (M.D. Ala. 1998) (holding employer entitled to summary judgment
because no evidence presented that employer knew or could have discovered that alleged
harasser would engage in sexual harassment before hired).  Consequently, the court finds that the
motion for summary judgment is due to be GRANTED on the negligent hiring claim.

The court also finds that the motion for summary judgment is due to be GRANTED on
the plaintiff's negligent training and supervision claim.  An employer's liability for negligent
hiring or supervision turns on affirmative proof that the alleged incompetence of the employee
was actually known to the employer or was discoverable by the employer if it had exercised care
and proper dilligence.  *See Ledbetter v. United Am. Ins. Co.*, 624 So. 2d 1371, 1373 (Ala. 1993).
Several Alabama courts have addressed the issue of whether an employer can be liable for
negligent hiring, supervision, and retention for failure to investigate or for inadequately
investigating an employee's complaint of sexual harassment.  *See e.g., Stevenson v. Precision
Standard, Inc*., 762 So. 2d 820, 824 (Ala. 1999), and cases cited therein.

Decisions interpreting Alabama law limit an employer's liability for failure to investigate
to occasions where the sexual harassment did not stop or when the sexual harassment ceased only

temporarily in spite of the employer's purported corrective action.  *See Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 987 (Ala. 1999); *Big B v. Cottingham*, 634 So. 2d 999, 1003-04 (Ala. 1993).

In this case, the record clearly indicates that the Werner promptly initiated an investigation, albeit it flawed, into Pritchett's complaints against Saffold and Thompson. Furthermore, the parties agree that, despite Lambert's conclusion that not enough evidence existed to corroborate Pritchett's claims of sexual harassment, Werner was prepared to move the plaintiff to another department where she would not have to work with Saffold and Thompson. Lastly, and perhaps more importantly, the parties agree that Pritchett was not subjected to any further harassment by Thompson and Saffold after reporting the sexual harassment. Consequently, the court finds that the plaintiff has not create a genuine issue of material fact on the issue negligent supervision or retention.  Thus, the motion for summary judgment is due to be GRANTED on the negligent supervision or retention claim.

## IV. CONCLUSION

After engaging in a thorough review of the record, the court the defendant's motion for summary judgment is due to be GRANTED in part and DENIED in part.  The court specifically finds that the defendant's motion for summary judgment on the state law invasion of privacy claim, the Title VII retaliation claim, and negligent hiring, training, and supervision claim is due to be GRANTED.  However, the defendant's motion for summary judgment on the FMLA interference claim and the Title VII sexual harassment claim is due to be DENIED.

The court will enter a separate order consistent with this memorandum opinion.

DONE and ORDERED this 16th day of March, 2006.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE